SUFIX, U.S.A., INC., Appellant,

v.

Tommy P. COOK, Appellee.

No. 2002–CA–001946–MR.

Court of Appeals of Kentucky.

Feb. 27, 2004.

Leslie W. Morris, II, Lizbeth Ann Tully, Stoll, Keenon & Park, LLP, Lexington, KY, C.A. Dudley Shanks, C. Steven Bryant, Segal and Shanks, Louisville, KY, for appellant.

Jeffrey L. Freeman, Tyler S. Thompson, Dolt, Thompson, Shepherd & Kinney, P.S.C., Louisville, KY, for appellee.

Before JOHNSON, KNOPF, and McANULTY, Judges.

## OPINION

KNOPF, Judge.

Sufix U.S.A., Inc., appeals from a judgment of the Jefferson Circuit Court, entered May 31, 2002, ordering it to pay about 2.8 million dollars in compensatory and nearly three million dollars in punitive damages to Tommy Cook as a result of injuries Cook sustained when a weed trimmer manufactured by Sufix disintegrated and various parts, including probably one of its sharp metal blades, impacted Cook's leg. Sufix contends that it was entitled to a directed verdict dismissing Cook's claim for punitive damages. Alternatively, it contends that the amount of the punitive damages award was excessive. We disagree with both contentions and affirm.

Sufix is a leading manufacturer of the plastic filament or string that serves as a cutting element in weed trimmers. The company also makes trimmer heads that house the string. In 1996 the company began developing a new trimmer head, called the Pro–Edge, with pivoting metal blades instead of string for use on thicker weeds and light brush. U.S. production and distribution of the Pro–Edge commenced in January 1998. In May of that year, Cook's employer, a real-estate developer and property manager, purchased a trimmer equipped with the Pro–Edge head and supplied it to Cook, one of his grounds keepers.

On May 19, 1998, Cook was using the trimmer for the first time to cut tall grass when, he testified, he felt the trimmer shimmy or vibrate and then felt a sharp blow to his right leg. He looked down and found the trimmer head shattered and his leg deeply gashed. The eight or nine-inch laceration damaged muscles, tendons, and nerves. Cook underwent two reconstructive surgeries, but never regained normal use of his right foot and calf. He walks with difficulty for short distances and for longer distances must use a wheelchair. He is totally occupationally disabled. The nerve damage has left him in constant pain.

Cook brought suit against Sufix in May 1999. He alleged that the Pro–Edge head had been defectively designed. By amended complaint he alleged that Sufix had been grossly negligent in failing to discover the defect. The matter was tried before a jury in May 2002. The jury sustained both of Cook's allegations and awarded compensatory and punitive damages, as noted above. Sufix does not challenge the finding that the Pro–Edge trimmer head that injured Cook was defective nor does it challenge on appeal the award of compensatory damages. It maintains, however, that the evidence provides no basis for the finding of gross negligence, or, if so, that the award of punitive damages was out of proportion to the degree of the company's fault.

As Sufix correctly insists, punitive damages may not be assessed for the mere commission of a tort. The defendant's misconduct must be shown to have been aggravated, to have amounted to gross negligence, or to reckless disregard for the lives and safety of others.[1] It is well established that punitive damages may be appropriate in a products liability action, notwithstanding that such actions initially focus on the state of the product rather than on the defendant's culpability.[2]

---

1. *Phelps v. Louisville Water Company*, Ky., 103 S.W.3d 46 (2003).

2. *Sand Hill Energy, Inc. v. Ford Motor Company*, Ky., 83 S.W.3d 483 (2002), vacated on other grounds, 538 U.S. 1028, 123 S.Ct. 2072, 155 L.Ed.2d 1056 (2003); *Masaki v. General Motors Corporation*, 71 Haw. 1, 780 P.2d 566 (1989); "Allowance of punitive damages in

The plaintiff must prove, in addition to an injury-causing product defect, that something about the defendant's conduct was outrageous, was at least grossly negligent, and amounted to reckless indifference.[3] Sufix contends that it was entitled to a directed verdict on the issue of punitive damages because Cook proved only that the Pro–Edge trimmer head was defective, not the additional element of gross negligence or reckless indifference. We review the trial court's denial of a directed verdict motion by asking whether the verdict rendered was palpably or flagrantly against the evidence.[4]

As originally designed and produced, the Pro–Edge employed a plastic cap to attach the metal blades to the trimmer shaft. Cook introduced expert testimony to the effect that the plastic cap was not strong enough to withstand the normal forces generated by the spinning blades and in particular that the cap had a tendency to fail at the points where the blades were knocked back against the cap when they struck objects too hard to cut, an occurrence likely in ordinary use. An expert testified that there was evidence of this sort of failure on the trimmer head that injured Cook.

In addition to this evidence of defect, Cook offered testimony by several experts that Sufix could and should have discovered the defect in the course of testing prior to release of the product, but that its testing had been grossly inadequate. Indeed, Sufix could not document any testing, its president could not recall whether impact tests had been made, and the only tests about which Sufix produced evidence were field tests by non-engineers. There

was also evidence that Sufix produced a stronger metal-capped version for distribution in Italy, where the plastic version was rejected, a rejection that should have put Sufix on notice that the plastic version was unsound. Nevertheless, Sufix distributed the cheaper plastic version in the United States. Cook presented evidence that soon after the release of the product Sufix received notice from customers of product failures but inadequately investigated those complaints. And Cook showed that in a company field test in April 1998, prior to Cook's injury, the plastic-capped Pro–Edge head had shattered and flung one of its blades, but still the company did not appreciate the defect or recall the product.

Sufix argues that its distribution of the plastic-capped Pro–Edge cannot be deemed negligent, much less grossly negligent. It did test the product, it claims, although as noted it was unable to substantiate that claim. It further claims that, early on, it began developing a stronger, metal-capped version of the trimmer head and that, as soon as it received complaints about the plastic-capped version, it began substituting the metal one. It adds that Cook's injury was the first to come to the company's attention, and promptly thereafter the company recalled the plastic model from its distributors (but not from its ultimate customers).

Cook argues that the plastic Pro–Edge should never have been marketed and that it would not have been marketed if it had been adequately tested. At the very least, Cook maintains, the plastic Pro–Edge should have been removed from the market sooner than it was.

products liability case," 13 A.L.R.4th 52 (1982).

**3.** *Sand Hill Energy, Inc. v. Ford Motor Company, supra.*

**4.** *Lewis v. Bledsoe Surface Mining Company,* Ky., 798 S.W.2d 459 (1990).

Several courts have held that a manufacturer's failure to test for defects that pose a risk of serious injury and that are susceptible to adequate pre-release testing can amount to a conscious or reckless disregard for the rights and safety of others and thus can justify an award of punitive damages.[5] We agree. Furthermore, we are convinced that the jury's finding to that effect was not flagrantly or palpably against the evidence. As summarized above, the evidence can reasonably be thought to indicate that Sufix did not test as it should have done, that its failure to do so was gross or reckless, and that had it done so it would have discovered before Cook's injury the unreasonably dangerous nature of the plastic Pro–Edge. The trial court did not err, therefore, by giving a punitive damages instruction.

■ Sufix next argues that the amount of the punitive damages award—nearly three million dollars—was excessive. Our review of that amount is *de novo* in light of the factors recently delineated by the Supreme Court in *BMW of North America, Inc. v. Gore*.[6] The amount must bear some reasonable relationship to the reprehensibility of the defendant's conduct, to the damage inflicted, and to the penalties assessed in like cases.

■ Although there is no simple application of these factors, reprehensibility is related to the degree of the defendant's consciousness of wrongdoing and to the extent to which that wrongdoing exposes others to serious injury. We have seen that Sufix can be thought to have acted recklessly, that is, with conscious disregard of a substantial risk that its inadequately tested product would cause serious bodily injury. While its conduct may not have been as reprehensible as some deliberate wrongdoing, its cavalier willingness to expose the public to an unreasonable risk of severe physical injury was egregious enough to merit a significant penalty.

The penalty imposed essentially doubled the amount of compensatory damages. Although the compensatory damages were substantial and included a large recovery for pain and suffering, the one-to-one ratio between the punitive award and the compensatory award is within the limits recently suggested by the United States Supreme Court.[7]

With respect to penalties assessed in other cases, we believe that Sufix was, or should have been, on notice that the distribution of a defective product capable of inflicting debilitating injuries could subject it to penalties doubling the damage it caused. Sufix cites several cases in which the award of punitive damages was much less than in this one, but fails to show that the cited cases involved comparable compensatory damages or comparable degrees of fault. In other cases involving severe permanent injury and a manufacturer's grossly deficient testing, comparable punitive damage awards have been upheld.[8]

**5.** *Shurr v. A.R. Siegler, Inc.*, 70 F.Supp.2d 900 (E.D.Wis.1999) (collecting cases); *Leichtamer v. American Motors Corporation*, 67 Ohio St.2d 456, 424 N.E.2d 568 (1981).

**6.** 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996); *Phelps v. Louisville Water Company, supra*.

**7.** *State Farm Mutual Automobile Insurance Company v. Campbell*, 538 U.S. 408, ——, 123 S.Ct. 1513, 1524, 155 L.Ed.2d 585, 606 (2003) ("When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee.").

**8.** *Smith v. Ingersoll–Rand Company*, 214 F.3d 1235 (10th Cir.2000) (ten million compensatory and seventeen million punitive for leg injury requiring amputation); *West v. Johnson & Johnson Products, Inc.*, 174 Cal.App.3d 831, 220 Cal.Rptr. 437 (1985) (one hundred thou-

There is no Kentucky case directly on point, but in *Phelps v. Louisville Water Company,*[9] a wrongful death case, our Supreme Court upheld a two million dollar punitive damages award, which was more than eleven times the compensatory award. The Court ruled that the water company "had or should have had notice that it may have been subject to a claim for significant damages if its gross negligence caused the death of two people."[10] No less, we believe, was Sufix on notice that its gross negligence causing a totally disabling and chronically painful injury could subject it to a penalty such as the punitive damages awarded in this case.

■■ Finally, Sufix contends that the trial court erred by failing to instruct the jury on the purpose of punitive damages, on the plaintiff's burden of proof, and by failing to require findings both of negligence and of gross negligence. None of these alleged errors was preserved for review. Sufix did not tender a punitive damages instruction, and it did not object to the trial court's proposed instruction beyond its contention that no instruction should be given. Generally, of course, a party may not acquiesce in a jury instruction and then complain about it on appeal.[11] In *Phelps v. Louisville Water Company,*[12] our Supreme Court declined to make an exception to that rule for a punitive damage instruction that allegedly failed to explain the purpose of punitive damages. Because the unpreserved errors alleged here are comparable, we likewise decline to address them.

In sum, not only did Sufix market an unreasonably dangerous product, but there was substantial evidence that it did so without conducting the rudimentary tests that would have revealed the danger and prevented Cook's disabling injury. The jury's verdict finding Sufix grossly negligent and liable for punitive damages was not palpably or flagrantly against that evidence. Nor was the three million dollar punitive damage award excessive. It doubled Cook's compensatory damages, which is a penalty both comparable cases and Supreme Court precedent indicate a manufacturer who cavalierly subjects the public to an unreasonable risk of catastrophic injury should expect. Accordingly, we affirm the May 31, 2002, judgment of the Jefferson Circuit Court.

ALL CONCUR.

---

sand compensatory and one million punitive for non-fatal toxic shock syndrome); *Leichtamer v. American Motors Corporation, supra* (one million compensatory and one million punitive for paralyzing back injury).

9. *supra.*

10. *Id.* 103 S.W.3d at 55.

11. CR 51.

12. *supra.*