**NISSAN MOTOR COMPANY, LTD.
and Nissan North America,
Inc., Appellants,**

v.

**Amanda MADDOX, Appellee.**

2013–SC–000685–DG

Supreme Court of Kentucky.

RENDERED: SEPTEMBER 24, 2015

Rehearing Denied May 5, 2016

MODIFIED: May 5, 2016

Counsel for Appellants: John Lewis Tate, David T. Schaefer, Bethany A. Breetz, Anne Katherine Guillory, Louisville.

Counsel for Appellee: Richard Wayne Hay, Somerset, James Paul Long, Jr., Sarah Hay Knight, Somerset.

## OPINION OF THE COURT BY JUSTICE CUNNINGHAM

On June 6, 2009, Amanda Maddox (now Gifford) and her then-husband, Dwayne Maddox, were traveling in their 2001 Nissan Pathfinder along Highway 127 in Lincoln County, Kentucky. Dwayne was driving and Amanda was sitting in the front passenger seat. Their vehicle was hit, head on, by a drunk driver who was driving on the wrong side of the road. The drunk driver was not wearing his seatbelt and was killed on impact.

Dwayne and Amanda were wearing their seatbelts and their airbags deployed properly. Dwayne, who weighed 170 pounds, suffered a fractured foot but sustained no other serious injuries. Amanda, who weighed 240 pounds, had to be extracted from the vehicle using hydraulic equipment and was immediately transported by helicopter to the University of Kentucky Medical Center.

Amanda sustained fractures to her ribs, vertebrate, hip, and hip socket. She also sustained nerve damage. Critically, Amanda's abdomen ruptured at the site of the gastric bypass surgery she had undergone years earlier. She endured additional tears to her bowel as well. As a result of her injuries, Amanda underwent 75 surgeries and spent 139 days in the hospital. She also experienced a stroke and other complications from an infection caused by the treatment.

In 2010, Amanda filed suit against the drunk driver's estate, Nissan Motor Company, Ltd, and Nissan North America, Inc. (collectively, Nissan). She specifically alleged that her injuries were caused by Nissan's defectively designed restraint system and failure to warn her about the system's limitations.

At trial, Amanda argued that the seatbelt system was defective because it was designed to protect only those occupants at or near the median weight provided in the Federal vehicle safety regulations. She also asserted that the front passenger seat was defectively designed and constructed. For her failure to warn claim, Amanda similarly argued that Nissan designed the Pathfinder's seatbelt system to achieve a five-star crash test rating in order to appeal to all customers, while neglecting the safety of larger occupants. The theme of her case was that Nissan chose "stars over safety."

During the course of an eight-day trial, each side presented extensive evidence, including expert testimony. At the close of Amanda's evidence, Nissan moved for a directed verdict on the issue of punitive damages. The trial court postponed ruling on the motion at that time. At the close of all evidence, Nissan renewed its directed verdict motion, which was denied.

A Lincoln County Circuit Court jury ruled in Amanda's favor and assessed 30 percent of the fault to the drunk driver and 70 percent of the fault to Nissan. The jury found Nissan responsible for approximately $2.6 million in compensatory damages and $2.5 million in punitive damages. The court entered a final judgment in accordance with the jury's verdict. Nissan moved to alter, amend or vacate the court's judgment. Nissan also moved for a

new trial and for a judgment notwithstanding the verdict. These post-trial motions were denied. Nissan appealed several rulings, including the denial of its directed verdict motion.

The Court of Appeals affirmed on all issues. However, the panel was divided on whether a punitive damages jury instruction was proper. That is the only issue now before this Court. Having reviewed the law and the facts, we hold that an instruction authorizing punitive damage against Nissan was inappropriate. Therefore, we reverse the decision of the Court of Appeals on that issue and vacate the trial court's judgment assessing punitive damages against Nissan.

### Standard of Review

■ When reviewing a ruling on a motion for directed verdict, we "must ascribe to the evidence all reasonable inferences and deductions which support the claim of the prevailing party." *Osborne v. Keeney*, 399 S.W.3d 1, 8 (Ky. 2012) (citations omitted). We will reverse only if the verdict is "palpably or flagrantly against the evidence so as to indicate that it was reached as a result of passion or prejudice." *Id.* at 9.

### Punitive Damages Jury Instruction

■ "In order to justify punitive damages there must be first a finding of failure to exercise reasonable care, and then an additional finding that this negligence was accompanied by wanton or reckless disregard for the lives, safety, or property of others." *Gibson v. Fuel Transport, Inc.*, 410 S.W.3d 56, 59 (Ky. 2013). *See also Phelps v. Louisville Water Co.*, 103 S.W.3d 46, 52 (Ky. 2003) (defining gross negligence as "a wanton or reckless disregard for the lives, safety or property of others."). In accordance with this standard,

the punitive damages jury instruction in the present case provided:

> [I]f you are further satisfied by clear and convincing evidence that Nissan acted in a grossly negligent manner and with a reckless disregard for the lives and safety of others, including Amanda Maddox, you may in your discretion award punitive damages against Nissan.

■ Even viewing the evidence in Amanda's favor, she failed to present proof that could establish such a degree of belief in the minds of reasonable jurors that would justify a punitive damages award. We hold that Nissan's conduct was neither reckless nor demonstrated a failure to exercise slight care. Therefore, the jury verdict awarding punitive damages was palpable and flagrantly against the evidence. *Osborne*, 399 S.W.3d at 8–9.

### Amanda's Evidence

The following evidence presented by Amanda at trial is critical to our analysis: 1) the seatbelt system that was installed in Amanda's 2001 Pathfinder; 2) the relevant Federal safety regulations and testing; and 3) the expert testimony. Additional evidence will be discussed as necessary.

#### The Seatbelt System

Amanda and Dwayne's front seatbelt systems were each equipped with a device called a load limiter. A load limiter is designed to allow additional belt webbing to spool out in the event of a frontal crash. The purpose of this device is to reduce the impact of the seatbelt upon an occupant's chest. More precisely, load limiters counter the seatbelt retraction that is immediately triggered upon impact, thus preventing potentially severe chest injuries such as cardio-respiratory injuries.

#### Federal Safety Regulations and Testing

Federal Motor Vehicle Safety Standards (FMVSS) are promulgated by the Secre-

tary of Transportation. 49 U.S.C. § 30101 et seq. Standard 208 mandates that all new vehicle models successfully complete a frontal crash test at 30 miles per hour using *unbelted* crash dummies weighing 171 pounds. 49 CFR § 571.208. For purposes of this test, 171 pounds represent an adult male weighing in the 50th percentile. The dummies are positioned in the driver and right front passenger seats. There is also a 223 pound dummy representing an adult male weighing in the 95th percentile. However, Standard 208 does not require testing with that dummy. As previously noted, Dwayne weighed 170 pounds, which is almost identical to the 50th percentile dummy. Amanda weighed 240 pounds, which is in excess of the 95th percentile dummy.

In 1986, the National Highway Transportation Safety Administration (NHTSA) instituted a New Car Assessment Program (NCAP) that permits car manufacturers to submit to more stringent tests than those dictated by Standard 208. NCAP is a voluntary program that employs frontal crash tests at 35 miles per hour instead of the mandatory 30 miles per hour required by the Standard 208 test. The NCAP test uses *belted* crash dummies weighing 171 pounds. The purpose of the Standard 208 and NCAP tests is to measure the aggregate impact of the collision on the dummies. Neither test dictates *how* manufacturers must design their vehicles in order to achieve better results on these tests. At the time the 2001 model Pathfinder was manufactured, NHTSA did not specifically regulate or test load limiters.

Upon completion of the more rigorous NCAP test, manufacturers receive star ratings reflecting their performance. Five stars represent the maximum rating and indicate the highest level of crash protection. After successfully completing the NCAP test, the 2001 model Nissan Pathfinder achieved a five-star front passenger crash safety rating. To clarify, Nissan performed the NCAP test using 171–pound dummies positioned in the driver and right front passenger seats. The dummies were restrained by seatbelt systems that were equipped with load limiters. The results of that test revealed that the front passenger seat load limiter released approximately two inches of webbing upon impact and resulted in minimal injury to the dummy.

It appears that Dwayne's seatbelt system functioned in a similar manner and resulted in minimal injures. However, Amanda's load limiter caused her seatbelt to release approximately nine and a half inches of webbing upon impact. Her injuries were severe.

Nissan marketed the 2001 model Pathfinder to highlight its five-star safety rating. Pathfinder models manufactured prior to 1999, did not contain load limiters and received lower star safety ratings. As previously discussed, Amanda argued that Nissan designed the seatbelt load limiter to achieve a five-star crash test rating in order to appeal to all customers, while neglecting the safety of larger occupants weighing outside of the 171–pound range.

*Expert Testimony*

Amanda's expert witness, Gary Whitman, is a safety restraint specialist who provided extensive testimony at trial. Whitman's testimony presented evidence from which reasonable jurors could have found Nissan negligent. Of course, the issue here is whether Mr. Whitman's testimony, along with other evidence, provided sufficient proof upon which reasonable jurors could have found Nissan grossly negligent. Having reviewed Whitman's testimony in its entirety, we will summarize that testimony and afford all inferences in Amanda's favor.

Whitman testified that velocity changes and collision forces to Amanda's vehicle were similar if not identical to the NCAP's 35 mile per hour frontal impact test—the voluntary and more stringent test to which Nissan subjected the 2001 model Pathfinder. He confirmed that the government does not mandate any testing using dummies weighing over 171 pounds. However, Whitman clarified that it is standard practice in the automotive industry to conduct seatbelt tests for the foreseeable range of occupants weighing at the 5th percentile (female) and 95th percentile (male).

In addition, Whitman testified that in 2003, General Motors issued a safety recall for its 1997 Blazer, Jimmy, and Bravada sport utility vehicles because the type of load limiters used on those vehicles allowed up to "10 additional inches of webbing into the seatbelt system." General Motors issued a voluntary safety recall in order to cure this defect. Mr. Whitman read one paragraph of that recall notice to the jury.

Whitman also demonstrated a Chrysler Sebring seatbelt system that included a cinching latch plate device that limited shoulder belt spool-out and prevented any webbing from feeding into an occupant's lap belt. Furthermore, Mr. Whitman identified an alternative load limiter design employed by Volvo that constrained the load limiter spool-out to one rotation, thus significantly restricting the amount of belt spool-out.

In contrast to these alternative designs, the 2001 Pathfinder's seatbelt system contained a free-sliding latch plate device that allowed for seatbelt webbing to feed into the shoulder belt unencumbered. According to Whitman, Nissan's design caused additional webbing to also feed into the lap belt. As a result, Whitman stated that the lap belt loosened from Amanda's pelvis, thus causing her to slide forward and underneath her lap belt. This "submarining" effect placed Amanda's weight on the front of her seat, which caused the seat ramp to collapse. The seat ramp consists of a piece of metal that is a fraction of an inch thick, and is designed to counter the negative effects of the passenger's pelvis shifting forward. Whitman also presented alternative seat ramp designs that he contended would have endured Amanda's weight and forward momentum without collapsing.

Based on his own testing, Gary Whitman determined that Nissan's load limiter allowed up to 11 inches of belt spool-out. He stated that this exceeded the amount allowed by Nissan's design specifications, which allowed up to approximately nine inches of webbing. In any event, Whitman opined that it was unreasonable to allow a load limiter to release even nine inches of webbing, and that such a design was not safe for occupants whose weight significantly deviated from the mean. Mr. Whitman's testing also revealed that the load limiter activated at a much lower level of force than Nissan's design specifications indicated.

Whitman concluded that the alternative latch plate and load limiter designs would have prevented Amanda from submarining under her lap belt and also prevented her seat from collapsing. Whitman further concluded that the only reason Amanda's seatbelt provided a greater amount of webbing spool-out was because Amanda weighed more than Dwayne and the 171–pound test dummy. Finally, Whitman determined that Nissan should have warned customers of the load limiter's limitations.

Amanda's injury and kinematics expert, Paul Lewis, testified that Amanda's submarining and seat collapse caused the injuries to Amanda's abdomen and lower extremities. Lewis specifically indicated that Amanda's abdominal injuries were a

result of her lap belt sliding off of her hip bones and onto her abdomen once she submarined. He further indicated that Amanda's pelvic and leg injuries were caused by her knees impacting the vehicle's dash panel. Mr. Lewis concluded that had Amanda not submarined and her seat not collapsed, she would not have sustained these injuries.

### Additional Evidence

Amanda also introduced portions of Nissan's pre-trial discovery responses wherein Nissan admitted to disposing of its developmental test reports including any reports concerning crashworthiness, front passenger seatbelt spool-out, submarining, and the effectiveness of the Pathfinder's seatbelt systems. Mr. Whitman explained in detail why he believed that Nissan's record retention policy was a bad engineering practice and protocol.

We do not question that Amanda's proof is sufficient for a negligence claim against Nissan. Our review, however, extends to the enhanced culpability required for punitive damages.

### Proving Gross Negligence

Successful completion of regulatory product testing weighs against a finding of gross negligence. Accordingly, exceeding mandatory requirements by successfully completing more rigorous testing strongly weighs against such a finding. The logic is clear. Meeting and then exceeding base safety requirements is, at the very least, facial evidence of exercising slight care. Federal courts applying Kentucky law have correctly observed this standard. *E.g., Cameron v. DaimlerChrysler Corp.,* No. Civ.A.5:04–CV–24, 2005 WL 2674990, at *9 (E.D.Ky. Oct. 20, 2005) (holding that the undisputed fact that manufacturer complied with Federal safety standards weighed against punitive damages). This approach has also been adopted by several

of our sister states. *E.g., Stone Man v. Green,* 263 Ga. 470, 435 S.E.2d 205, 206 (1993) (holding that punitive damages "are, as a general rule, improper where a defendant has adhered to environmental and safety regulations.").

The undisputed evidence demonstrates that Nissan designed its 2001 Pathfinder, including its components and subcomponents, to withstand the most rigorous frontal crash testing offered by the Federal government at that time. While those tests may have been performed using body weight metrics that no longer reflect our increasingly portly population, Nissan nevertheless satisfied and exceeded the regulatory duty imposed upon it.

Where the evidence indicates that relevant regulatory duties have been satisfied, manufacturers such as Nissan may nevertheless be found to have breached a duty of ordinary care imposed by the common law. However, there is typically no breach under the common law for failure to exercise *slight* care where the undisputed evidence indicates that relevant regulatory duties have been satisfied. Compare *Sufix, U.S.A., Inc., v. Cook,* 128 S.W.3d 838, 841 (Ky.App. 2004) (affirming punitive damages where manufacturer "could not document *any* testing, its president could not recall whether impact tests had been made, and the only tests about which Sufix produced evidence were field tests by non-engineers.") (emphasis added).

■ Nevertheless, mere compliance with regulatory products standards, either mandatory or voluntary, does not automatically foreclose a punitive damages jury instruction. In other words, proof indicating that a manufacturer exercised slight care by complying with relevant regulatory mandates is not dispositive where additional evidence is presented that tends to

prove reckless or wanton conduct. However, no such evidence was presented here.

In contrast to the present case, the evidence presented in *Sufix, U.S.A., Inc., v. Cook* demonstrated reckless or wanton conduct on behalf of the manufacturer, thus justifying punitive damages. That case involved a defective weed trimmer that disintegrated during its first use and caused permanent injuries to the operator's leg. *Id.* at 840. The trial court denied the manufacturer's motion for a directed verdict on the issue of punitive damages. *Id.* at 841. The jury awarded $2.8 million in compensatory damages and nearly $3 million in punitive damages. *Id.* at 840. The Court of Appeals affirmed the trial court's ruling denying the directed verdict motion and sustained the jury's verdict. *Sufix,* 128 S.W.3d at 843.

The court determined that, in addition to the complete failure to document any testing, "[t]here was also evidence that Sufix produced a stronger metal-capped version for distribution in Italy, where the plastic version was rejected." *Id.* at 841. The court also determined that this rejection "should have put Sufix on notice that the plastic version was unsound." *Sufix* at 841. Furthermore, the court stated that soon after the deficient product was released in the United States, "Sufix received notice from customers of product failures but inadequately investigated those complaints." *Id.* Such notice or awareness was nonexistent in the present case.

Similar to *Sufix,* other states have also recognized certain situations in which punitive damages are appropriate. For example, in *General Motors Corp. v. Moseley,* the appellate court sustained a punitive damages award in spite of the manufacturer's compliance with FMVSS testing. 213 Ga.App. 875, 447 S.E.2d 302, 311 (1994) (abrogated on other grounds by *Webster v. Boyett,* 269 Ga. 191, 496 S.E.2d 459, 463 (1998)). Critically, however, evidence was presented that the manufacturer "was aware of the problems inherent with placement of the fuel tanks outside the frame on its full-size pickup trucks[,]" which caused the tanks to explode upon impact, resulting in the death of the driver. *Id.* Similarly, in *Gryc v. Dayton–Hudson Corp.,* the Court sustained a punitive damages jury verdict where a child's pajamas caught fire despite the manufacturer's compliance with required flammability testing. 297 N.W.2d 727, 733–34 (Minn. 1980). In so holding, the Court determined that the evidence established that the manufacturer knew that the regulatory testing was invalid and could not properly evaluate the flammability of its product. *Id.* at 734. The Court noted that one of the manufacturer's top officials admitted notice of the dangerous condition in a written memorandum. *Id.* In contrast to *Sufix, Moseley,* and *Gryc,* Amanda failed to introduce any evidence that should have put Nissan on notice that either its seatbelt or seat system was unsound, or that the requisite regulatory testing was irrelevant or invalid.

For instance, while Amanda's evidence of alternative designs employed by other manufacturers may have tended to prove Nissan's negligence, failure to adopt alternative designs here does not indicate Nissan's reckless disregard for the lives or safety of occupants. The existence of a better design may indicate that an inferior design was unreasonably dangerous applying the reasonably prudent manufacturer standard. However, a better design does not automatically indicate that an inferior design was recklessly or wantonly dangerous. In fact, Amanda's restraint expert, Gary Whitman, acknowledged that essentially all vehicles use some type of load

limiter system. Amanda's injury expert also conceded that in the absence of a load limiter, Amanda would have possibly sustained more severe injuries to her chest.

And the fact that Nissan engaged in additional testing, the optional NCAP tests, shows that it exercised at least slight care above even what the federal regulations required. Yes, that testing resulted in the five-star rating, but it was nevertheless additional, more-rigorous testing (since it was performed at a higher speed). The authorities discussed above demonstrate that a lack of slight care, after compliance with regulatory requirements, is provable only by evidence of extremely bad conduct, such as continuing to distribute a product with known dangerous defects or where the manufacturer knows that the federal testing is invalid. Amanda simply offered no such evidence. Instead, her proof was really the absence of proof: Nissan could not show that it had conducted safety testing with 95th percentile dummies at any point. But the burden of proof was on Amanda, not Nissan.

Lastly, Nissan's admitted disposal of its developmental test materials was due to its record retention policy requiring that such materials be retained for one year after the start of production of the vehicle model at issue. After that period, the materials were discarded. This type of policy is not unique, and certainly not nefarious. The mere absence of these documents does not permit a reasonable inference that Nissan intentionally disregarded relevant materials, or that those materials demonstrated that the seatbelt system was deficient. *See University Medical Center, Inc. v. Beglin,* 375 S.W.3d 783, 791 (Ky. 2011) (citing Robert G. Lawson, *The Kentucky Evidence Law Handbook* § 2.65[3] (4th ed., 2003) ("An inference based on destruction (or loss) may not be drawn if the destroyer acted inadvertently (mere negligence) or if there is an adequate explanation for the destruction (or loss).")).

In summary, while Amanda's injuries were monumental, the evidence presented at trial fails to indicate that such an outcome was the result of Nissan's reckless or wanton disregard for Amanda or those similarly situated. Any evidence that could reasonably be construed in Amanda's favor on this issue was neither clear nor convincing.

### Excessive Punitive Damages

Since the jury instruction permitting an assessment of punitive damages was inappropriate here, there is no need to review the constitutionality of the punitive damages award. *See BMW of North America, Inc. v. Gore,* 517 U.S. 559, 568, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996) ("Only when an award can fairly be categorized as 'grossly excessive' ... does it enter the zone of arbitrariness that violates the Due Process Clause of the Fourteenth Amendment.").

### Conclusion

For the foregoing reasons, we hereby reverse the judgment of the Court of Appeals on the issue of punitive damages, and vacate the Lincoln Circuit Court's judgment assessing punitive damages against Nissan.

All sitting. Minton, C.J., Hughes, Keller, Noble, JJ., concur. Barber, J., dissents by separate opinion in which Venters, J., joins.

BARBER, J., DISSENTING:

Respectfully, I dissent. As the majority notes, Amanda's expert, Whitman, confirmed that the government does not mandate testing using dummies weighing over 171 pounds. However, Whitman clarified that it is standard industry practice to

conduct seatbelt tests for the foreseeable range of occupants weighing at the 5th (female) and 95th (male) percentiles. Nissan admitted to disposing of its developmental test reports. The Court of Appeals concluded that "in the light of the lack of proof of Nissan's testing and the wide scope of risk to others, it was not palpably or flagrantly against the evidence for the jury to find that punitive damages were appropriate." I agree and would affirm.

Venters, J., joins.