RENDERED:  MARCH 10, 2023; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2022-CA-0063-MR

MICHAEL R. HEILIG, M.D.                                    APPELLANT


APPEAL FROM CLARK CIRCUIT COURT
v.          HONORABLE BRANDY OLIVER BROWN, JUDGE
ACTION NO. 19-CI-00122


BILL PRITCHARD, AS
ADMINISTRATOR OF THE ESTATE
OF REBECCA PRITCHARD,
DECEASED AND INDIVIDUALLY
AS SURVIVING SPOUSE;
KENTUCKY HOSPITAL LLC D/B/A
CLARK REGIONAL MEDICAL
CENTER AND LIFEPOINT
HOLDINGS 2 LLC; LIFEPOINT OF
KENTUCKY LLC; AND MICHAEL R.
HEILIG PLLC, D/B/A KENTUCKY
ORTHOPAEDIC ASSOCIATES                                    APPELLEES


OPINION
AFFIRMING

** ** ** ** **

BEFORE:  ACREE, COMBS, AND ECKERLE, JUDGES.

COMBS, JUDGE: This is a medical negligence case. Rebecca Pritchard and her husband, Bill Pritchard, filed a lawsuit against Dr. Michael Heilig based upon the total hip replacement surgery that he performed on Rebecca's right hip in May 2018. After considering the evidence, a jury awarded $215,827 for Rebecca's medical expenses and $220,000 for her mental and physical pain and suffering. The jury rejected Bill Pritchard's claim for loss of consortium but awarded punitive damages against Dr. Heilig in the amount of $325,000. Dr. Heilig appeals. After our review, we affirm.

The plaintiffs' evidence at trial showed that Rebecca suffered with severe osteoarthritis; *i.e.*, the cartilage inside her joints was damaged and thin. She was plagued with chronic pain and stiffness in her hips. Because neither therapy nor injections provided lasting relief, Rebecca decided to undergo total hip replacement surgery.

On the afternoon of May 8, 2018, Dr. Heilig of Kentucky Orthopedic Associates performed surgery on Rebecca's right hip. Cartilage was reamed from her right acetabulum[1] in preparation for the fitting of an artificial acetabular cup (socket) that would be affixed to the inside of her natural or "native" acetabulum with screws. During surgery, Dr. Heilig over-reamed the acetabulum and penetrated the acetabular wall into Rebecca's pelvis. While this is a rare

---

[1] The cup-shaped socket of the hip.

occurrence, it is recognized as a potential complication of hip replacement surgery. Because of the variability in the human anatomy, over-reaming **is not** regarded as a breach of the surgeon's duty of care. However, failure to appreciate the over-reaming and to address the complication **is** deemed to be a breach of the surgeon's standard of care.

Surgeons are aware when over-reaming has occurred. A procedure to graft bone from the patient's femur head onto the acetabular wall can be undertaken during surgery to repair the breach. This repair adds an additional 30 minutes to a hip replacement surgery that could ordinarily be expected to last approximately 90 minutes.

Although he was aware of the remedial technique, Dr. Heilig did not graft bone to repair the over-reaming of Rebecca's acetabulum. Instead, the acetabular cup was seated just as if the over-reaming had not occurred. In fact, a portion of the acetabular cup appeared to be seated inside Rebecca's pelvis. It was affixed there with screws. The use of screws is typical in hip replacement surgery; affixing the acetabular cup with screws into bone prevents movement of the cup while the artificial component implants over time. Next, the femoral prosthesis (ball) was fitted to the artificial cup, thereby replacing the native hip structure. Then the femoral prosthesis was attached to Rebecca's femur.

An x-ray was taken immediately after Rebecca's surgery. It confirmed that a portion of the artificial cup and the screws protruded beyond the acetabular wall and into soft tissue. Rebecca's x-ray indicated a substantial departure from what is observed in reference x-rays. However, Dr. Heilig made no mention of any complication in his operative note, reporting instead "excellent fixation" of both the cup and screws.

Even though he had elected not to repair the breach of the acetabular wall, Dr. Heilig could have met the standard of care if he had restricted Rebecca's weightbearing status during her recovery. Limiting Rebecca's weightbearing status may have allowed the implant to remain sufficiently stable while bone grew into the artificial component as required for the procedure to be regarded as successful. However, Dr. Heilig did not limit Rebecca's weightbearing status. Eventually, the unsecured artificial cup shifted or loosened as she put her full weight on it during rehabilitation. This shifting prevented bone from encasing the component and caused scar tissue to develop.

The following day, Rebecca was examined at the hospital by Kurt Schlenther, Dr. Heilig's physician's assistant. Schlenther directed in a progress note that Rebecca could be "[f]ull weightbearing as tolerated" in her physical therapy. Schlenther had not seen the x-ray taken immediately after surgery; he was unaware of the complication that had arisen. Schlenther expected that Dr. Heilig

would instruct him specifically if Dr. Heilig wanted an order of limited weightbearing rather than full weightbearing. Schlenther was not instructed by Dr. Heilig that Rebecca's weightbearing should be limited.

Two days later, on May 10, 2018, an unrelated surgical procedure being performed by Dr. Heilig on another patient was interrupted when it appeared that Dr. Heilig was impaired in the operating room. Dr. Heilig met right away with a hospital administrator who relieved him of his duties. His privileges at the hospital were withdrawn. Heilig had no further contact with Rebecca, and he did not participate again in her post-operative care. He never returned to the hospital and did not return to work with Kentucky Orthopedic Associates. He provided no further instruction concerning Rebecca's continuing care.

Rebecca was discharged from the hospital before 8 a.m., on May 11, 2018. In the discharge summary, Schlenther directed again that Rebecca could be "full weightbearing as tolerated" for continued physical therapy at a transitional care unit. Schlenther had not received instructions about Rebecca's ongoing care from Dr. Heilig. She underwent an extended rehabilitation until June 1, 2018.

On June 8, 2018, one month after her surgery, Rebecca was examined by Schlenther at the offices of Kentucky Orthopedic Associates. Schlenther was now under the supervision of Dr. Gregory Grau, another doctor practicing with Kentucky Orthopedic Associates. Upon reviewing an x-ray of the hip replacement

taken on June 8, 2018, Schlenther observed the position of the artificial acetabular cup and screws protruding beyond the acetabular wall. Schlenther consulted with Dr. David Waespe of Kentucky Orthopedic Associates, who suggested that Rebecca be re-examined in two-months' time to evaluate whether bone had nevertheless begun to grow into the component.

On July 17, 2018, Rebecca was examined by Michael Bradley, a physician's assistant supervised by Dr. Waespe. In the x-ray, Bradley also observed that the artificial component was protruding through the acetabular wall of the right side of Rebecca's pelvis. Rebecca felt that the poor condition of her left hip was impeding the rehabilitation of her right hip and elected to undergo a left hip replacement procedure. Dr. Waespe performed the left hip replacement without incident in August 2018. Thereafter, Rebecca was released to *limited weightbearing* for physical therapy.

Six weeks following her second hip replacement surgery, Rebecca was examined again by Michael Bradley. Although she reported no significant complaints with respect to her left hip, Rebecca's right hip continued to cause her severe pain.

Based on persistent right hip pain, Rebecca was examined by Dr. Grau of Kentucky Orthopedic Associates in October 2018. Rebecca could ambulate with a walker. Dr. Grau reported that he was concerned that the right hip

components were loosening. He ordered a computed tomography (CT) scan. The radiologist, Dr. Betsy Izes, reported that the artificial acetabular cup and a screw were protruding through the soft tissue of Rebecca's pelvic wall. Rebecca's pelvis was now seen to be fractured. Dr. Izes's observations of the margins of the fracture indicated that it was not of recent origin.

On December 12, 2018, Brandon Embry, a physician's assistant supervised by Dr. Grau, examined Rebecca at Kentucky Orthopedic Associates. Rebecca suffered with excruciating pain in her right hip daily and was now dependent on a wheelchair. After reviewing the results of her CT scan, Dr. Grau and Dr. Waespe recommended that Rebecca be referred to Dr. Jeffrey Selby at the University of Kentucky for revision surgery to her right hip. Rebecca declined the recommendation; she saw Dr. Jonathan Yerasimides in Louisville instead.

Dr. Yerasimides performed a successful revision surgery to Rebecca's right hip. She was ordered to be limited weightbearing until sufficient healing had occurred. She recovered well and became physically active, walking several miles each day. The Appellants believe that if Dr. Heilig had appreciated the consequences of his over-reaming of Rebecca's acetabulum and had taken remedial measures (either repairing the breach of the acetabulum with a bone graft during surgery or restricting her weightbearing status during her recovery and

rehabilitation), the revision procedure undertaken by Dr. Yerasimides would not have been necessary.

On February 21, 2019, the Pritchards filed a medical negligence action against Dr. Heilig. Heilig answered and denied the Pritchards' allegations. Following a cancer diagnosis, Rebecca died in February 2021. The medical negligence action was revived in accordance with the provisions of KRS[2] 411.140, and Rebecca's Estate was substituted as a party-plaintiff. Following a period of pre-trial discovery, the case was tried before a jury. The jury found in favor of Rebecca's Estate and awarded damages, including punitive damages, against Dr. Heilig. This appeal followed.

On appeal, Dr. Heilig argues that the trial court erred by permitting the evidence concerning the events of May 10, 2018, to come before the jury. He contends that the evidence was irrelevant (as prohibited character evidence) and that it was unduly prejudicial. Next, Dr. Heilig argues that evidence regarding the proceedings that he faced before the Kentucky Board of Medical Licensure (KMBL) was also inadmissible. Finally, Dr. Heilig argues that the trial court erred in its instructions to the jury. We address these issues in the order in which they were presented.

---

[2] Kentucky Revised Statutes.

Dr. Heilig filed a motion *in limine* to exclude the evidence that he now challenges on appeal. In that motion, he argued that the events of May 10, 2018, were entirely collateral to the alleged medical negligence of May 8, 2018. Despite proof that he had ingested controlled substances before surgery on May 10, he argued that the evidence is not probative of any impairment on May 8. He contended that there was no proof to indicate that he was impaired by controlled substances during *any* surgical procedure that he *ever* performed. Under the circumstances, he contended that admission of the disputed evidence was unduly prejudicial.

He requested the court to exclude evidence related to the events of May 10, specifically including the investigation that followed and the proceedings undertaken before the KBML. He sought to exclude evidence related to his medical records, medical history, use of prescription medications, and the results of a urine test taken on May 10, 2018. Dr. Heilig asserted that the disputed evidence did not prove that he was impaired by controlled substances when he undertook Rebecca's hip replacement surgery. He contended that the proceedings before KBML were confidential and contained privileged communications. He argued that evidence related to the parties' informal resolution of KBML's investigation into his alleged substance abuse was "particularly inappropriate."

In response, the Estate's counsel argued that the disputed evidence was relevant because it was "probative of the fact that Dr. Heilig was impaired on May 10, 2018, while [Rebecca] was awaiting discharge to the [transitional care unit] for physical therapy and occupational therapy." Counsel noted his statutory duty to manage the activities of his physician's assistant and to accept responsibility for the medical services delivered by his physician's assistant. Dr. Heilig was unable to fulfill that duty because he had ingested controlled substances that significantly impaired his judgment. However, counsel indicated specifically that the plaintiffs had "no particular interest in mentioning Dr. Heilig's proceedings in the Kentucky Board of Medical Licensure." Counsel nonetheless noted that parts of Heilig's correspondence with KBML and his informal settlement with KBML could be admissible as prior inconsistent statements if they were to become necessary for impeachment purposes.

The trial court denied Dr. Heilig's motion *in limine.* At trial, the disputed evidence was presented to the jury in the following manner. The Estate's counsel called Dr. Heilig as his first witness. Dr. Heilig testified concerning his training and experience and the nature of his current surgical practice. He indicated that less than 1% of his total hip replacement procedures failed or needed revision. He indicated that he did not recall seeing Rebecca after her surgery on

May 8, 2018, but that he would have seen his patient in recovery as a matter of course.

Dr. Heilig testified that Rebecca reported to him before surgery that she had pain in both hips but that her right hip was more painful. While he described Rebecca's native acetabulum as eggshell thin and protruding into her pelvis in a condition referred to as protrusio, Dr. Heilig testified that she remained a good candidate for total hip replacement surgery.

He described the typical hip replacement procedure at length, including the reaming process and the use and placement of screws to affix the artificial cup to bone. With respect to Rebecca's surgery in particular, Dr. Heilig testified that he did not ream through the native acetabulum into Rebecca's pelvis; that the artificial cup that he seated did not protrude into her pelvis more than the native acetabulum; and that the screws were properly placed to affix the component.

Dr. Heilig described how a bone graft procedure could be used to repair an over-reamed acetabulum, but he explained that it was not always necessary to repair the breach if a larger sized artificial cup is seated. According to Dr Heilig, he replaced a portion of Rebecca's native acetabulum -- which was already in protrusion -- with the artificial component in nearly the same position in accordance with his training. He did not recall having a discussion concerning the

surgery with Schlenther, his physician's assistant, and explained that it was not unusual for Schlenther to make rounds at the hospital to check on surgery patients. Reading from his post-operative notes, Dr. Heilig indicated that had reported no complications during Rebecca's surgery. He testified that he could not recall making any more notes or orders with respect to Rebecca's care.

Next, counsel questioned Dr. Heilig about his schedule on May 10, 2018. Counsel recounted that Dr. Heilig performed two surgeries that morning before an issue was raised about "your demeanor, your affect, *about something*" in the operating room. Counsel read from a written statement prepared by an operating room witness that indicated that Dr. Heilig was "losing his balance" and was "not acting like himself"; and that he seemed confused about the surgical procedure he was about to undertake.

Counsel also read from a written statement prepared by an investigator at the hospital indicating that he met with Dr. Heilig, who, while he appeared to be impaired, agreed to submit to a drug screen. For another couple of minutes, counsel rehashed with Dr. Heilig the contents of the written statements. Dr. Heilig agreed that Rebecca was two-days' post-surgery and that she had not been released from the hospital on May 10, 2018. He testified that he prepared a post-operative order that included his plan for Rebecca's post-surgical care.

Counsel then asked Dr. Heilig whether he was impaired on May 10. Dr. Heilig explained that he was coming down with flu and was perhaps rendered impaired by those symptoms. He explained that he had taken Ambien on the night of May 9, 2018, to help him sleep. However, his urine screen indicated the use of opiates. Dr. Heilig admitted that he had taken Percocet (from an outdated prescription) for neck pain within a 30-day time frame prior to May 10. He did not dispute that Percocet can be detected in urine for only 2 to 3 days. He admitted that he had hypothesized earlier that he may have ingested Percocet while under the influence of Ambien. He denied having taken Xanax and could not explain how Xanax was detected in his May 10 urine sample. He testified that he was well aware of the effects of the controlled substances that he ingested but denied that he was impaired by those substances on May 10, 2018.

During examination by defense counsel, Dr. Heilig related that he had attended his daughter's birthday party on the evening of May 10, 2018, and that he then went to bed with flu. He explained that he was bed-ridden for another five or six days. Counsel immediately asked Dr. Heilig about a hearing conducted before the Kentucky Board of Medical Licensure. Dr. Heilig explained that he entered into an agreement to resolve the KBML's investigation in an effort to preserve his livelihood. He explained that he has submitted to more than 200 drug screens as part of that agreement -- all of which have been negative for controlled substances.

-13-

With respect to Rebecca's surgery, Dr. Heilig explained that her care was governed by standard post-operative orders prepared after her surgery and that he and his physician's assistant would communicate only if there were specific issues to be addressed. At length, he again described typical hip replacement procedures. He used Rebecca's x-rays (both pre- and post-operative) and the CT scan to explain the specifics of her anatomy and the nature of the surgery he performed to replace her hip. Dr. Heilig outlined his education, qualifications, and his current practice. He denied that he breached the applicable standard of care.

We review the trial court's rulings concerning evidentiary issues for an abuse of discretion. *Manus, Inc. v. Terry Maxedon Hauling, Inc.*, 191 S.W.3d 4 (Ky. App. 2006). The trial court abuses its discretion only where its decision is arbitrary, unreasonable, or unsupported by sound legal principles. *Goodyear Tire and Rubber Co. v. Thompson*, 11 S.W.3d 575 (Ky. 2000).

Kentucky Rule of Evidence (KRE) 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." The purpose of the rule is to prevent the use of "character evidence" (or evidence of an actor's propensity) only to show that an actor behaved in a particular way because he behaved in a similar way on a different occasion. *Trover v. Estate of Burton*, 423 S.W.3d 165 (Ky. 2014). Such evidence can distract the trier of fact from the relevant question of

what actually happened on the day in question. *Id.* (citing *Clark v. Commonwealth*, 223 S.W.3d 90 (Ky. 2007)).

In a medical negligence case, "the plaintiff must prove that the treatment given was below the degree of care and skill expected of a reasonably competent practitioner and that the negligence proximately caused injury or death." *Reams v. Stutler*, 642 S.W.2d 586, 588 (Ky. 1982) (citing *Blair v. Eblen*, 461 S.W.2d 370 (Ky. 1970)). Dr. Heilig would invoke KRE 404(b) to bar evidence relating to his alleged impairment on the day of Rebecca's surgery as unrelated to his competence and skill on that day -- or in the alternative, as being more prejudicial than probative. With respect to this judgment call as to evidence that had an undoubtedly prejudicial component, we do not agree that the trial court erred in determining that such evidence was more probative than prejudicial. We also note that the ongoing care of Rebecca after surgery constituted a continuum. KRE 404(b) could not even arguably serve to bar admission of the unequivocal evidence that was introduced to establish that **while Rebecca remained under his care**, Dr. Heilig was impaired by his ingestion of controlled substances and was thus rendered unable to provide the degree of care and skill required.

Through testimony regarding the urine sample taken on the afternoon of May 10, and Dr. Heilig's own testimony, the Estate was able to show that Dr. Heilig had ingested controlled substances one, two, and/or three days before May

10, 2018, and that he consumed Ambien on a regular basis. Heilig's toxicologist, Dr. Timothy Rohrig, explained the meaning of the urine test report prepared on May 10, 2018. In his testimony, Dr. Rohrig explained that a urine test detects substances that have been excreted by the body and may no longer have an effect upon it. He indicated that the effects of the controlled substances detected in Dr. Heilig's urine had necessarily waned by the time the urine sample was collected on the afternoon of May 10, 2018.

While the results of the urine test -- in isolation -- could not prove impairment, the observations of those around an individual who had ingested a substance *could* show impairment. The statements of witnesses who observed Dr. Heilig's behavior -- both in the operating room and after the surgical procedure was halted on May 10 -- tended to show that the doctor was impaired by his ingestion of the identified substances. The evidence reliably supported a conclusion that Dr. Heilig was, in fact, impaired during the time that Rebecca was under his care. The disputed evidence was relevant because it tended to show that Dr. Heilig was unable to provide the level of care necessary during that time, and it was properly offered for that purpose.

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of undue prejudice . . . ." KRE 403. Dr. Heilig contends that the trial court erred in its evaluation of the disputed evidence

because the limited probative value of the evidence was greatly outweighed by the clear risk of undue prejudice to him. Again, assessment of the evidence pursuant to the requirements of KRS 403 is a "task properly reserved for the sound discretion of the trial judge." *Commonwealth v. English*, 993 S.W.2d 941, 945 (citing *Rake v. Commonwealth,* 450 S.W.2d 527, 528 (Ky. 1970)).

The timeframe established by the toxicologist for Dr. Heilig's ingestion of the controlled substances and the eyewitnesses' unequivocal reports concerning his impairment coincided with the period of time of Rebecca's care. Thus, the evidence was highly probative despite its obvious prejudicial impact. Thus, we cannot say that the trial court erred by concluding that the probative value of the evidence was not significantly outweighed by the risk of *undue* prejudice to Dr. Heilig. We conclude that the trial court did not err by denying the motion *in limine* seeking to exclude this relevant evidence.

We next address Dr. Heilig's argument related to the evidence presented to the jury concerning the investigation undertaken by the KBML after the incident of May 10 and the outcome of the administrative proceedings that followed. Dr. Heilig contends that the presentation of this evidence to the jury was "particularly inappropriate." However, he does not dispute that the Estate represented in its response to his motion *in limine* that it had "no particular interest in mentioning Dr. Heilig's proceedings in the Kentucky Board of Medical

-17-

Licensure." Nor does he dispute the representation in the appellees' brief to this Court that the Estate's counsel "never asked Dr. Heilig or anyone else a single question about his medical license or his case with the KBML." Counsel observes in his brief: "it certainly would have been fair game to use Dr. Heilig's letter and stipulations with KBML as impeachment under KRE 607 & 608, [but] undersigned did not mention or reference either a single time."

Our review of the trial indicates that it was only upon questioning from **his own counsel** that Dr. Heilig himself discussed the KBML investigation and proceedings. By way of explanation, Dr. Heilig insists that the trial court's pre-trial rulings "forced [him] to address certain issues surrounding the trial court's admission of inappropriate evidence in hopes to mitigate the damage." Under the circumstances, we disagree. We are persuaded that Dr. Heilig waived any error with respect to the trial court's denial of his motion *in limine* by presenting this specific evidence to the jury in his own testimony. Counsel cannot elect to elicit the testimony at trial only to argue on appeal that it was error to admit it. By opening that evidentiary door, he forfeited the right to object.

Finally, Dr. Heilig argues that the trial court erred in its instructions to the jury. He contends that the trial court erred by giving the jury a punitive damages instruction. Dr. Heilig argues that the trial court gave the disputed instruction based on a "hypothetic injury" because "there was never an issue at the

-18-

hospital that required [him] to visit [Rebecca.]"  Additionally, he observes that the plaintiffs' "expert never testified that any of the actions taken by Dr. Heilig were a 'gross or reckless deviation from the standard of care.'"

The trial court instructed the jury that it could award punitive damages only upon a finding that Dr. Heilig "acted toward Rebecca Pritchard with malice or gross negligence."  It defined "malice" to mean conduct "carried out with both flagrant indifference to plaintiff's right and a subjective awareness that such conduct would result in human death or bodily harm."  It defined "gross negligence" to mean "wanton or reckless disregard for the rights, lives, safety, or property of others."

A trial court has a duty to instruct the jury as to every theory of law reasonably supported by the evidence.  *Zewoldi v. Transit Authority of River City*, 553 S.W.3d 841 (Ky. App. 2018).  When we consider whether a trial court erred by giving an instruction that was not supported by the evidence, our role is to determine whether it abused its discretion.  *Sargent v. Shaffer*, 467 S.W.3d 198 (Ky. 2015), *overruled on other grounds by University Medical Center, Inc. v. Shwab*, 628 S.W.3d 112 (Ky. 2021).

Punitive damages may be awarded when a jury seeks to punish a defendant or to deter others from similar conduct.

> [Punitive damages] are given to the plaintiff over and
> above the full compensation for his injuries, for the

purpose of punishing the defendant, of teaching him not to [commit the wrongdoing] again, and of deterring others from following his example." *Hensley v. Paul Miller Ford, Inc.*, 508 S.W.2d 759, 762 (Ky. 1974) (quoting Prosser, *Law of Torts* § 2 (4th Ed.)). A party is entitled to have the jury instructed on the issue of punitive damages 'if there was *any evidence* to support an award of punitive damages.'" *Thomas v. Greenview Hospital, Inc.*, 127 S.W.3d 663, 673 (Ky. App. 2004), *overruled on other grounds by Lanham v. Commonwealth*, 171 S.W.3d 14 (Ky. 2005) (quoting *Shortridge v. Rice*, 929 S.W.2d 194, 197 (Ky. App. 1996)).

Punitive damages can be awarded under the common law standard of "gross negligence." To demonstrate gross negligence, a party must first show that the defendant failed to exercise reasonable care and then show that the negligence was accompanied by "wanton or reckless disregard for the lives, safety or property of others." *Nissan Motor Company, Ltd. v. Maddox*, 486 S.W.3d 838, 840 (Ky. 2015). "Multiple acts of negligence, each of which -- if considered in isolation -- might not support a finding of wantonness, may support a finding of gross negligence when considered alongside one another." *Louisville SW Hotel, LLC v. Lindsey*, 636 S.W.3d 508, 514 (Ky. 2021).

Drawing all reasonable inferences in favor of the appellees from the testimony recounted above, the jury could have inferred that Dr. Heilig was impaired when he undertook Rebecca's hip replacement surgery and/or afterward when she remained under his care and that he was acutely aware of the risks of

impairment while he was responsible for her well-being. The jury could have reasonably inferred that the doctor was unable to appreciate the complication that arose during Rebecca's surgery and to address it either during surgery or post-operatively. It could also have inferred from the testimony that his impairment impacted Dr. Heilig's ability to provide adequate supervision of Rebecca's medical care while she remained his patient -- in reckless disregard for her life and safety.

Consequently, we are persuaded that the trial court did not abuse its discretion by concluding that the evidence warranted a punitive damages instruction. Furthermore, because "[t]here is no sharp, well-defined, dividing line between simple negligence and gross negligence[,]" the degree of negligence is a question to be resolved by a jury. *Darnell v. Hamilton*, 358 S.W.2d 361, 362 (Ky. 1962); *see also Douglas v. Wood*, 254 S.W.2d 490 (Ky. 1953). Despite the assertion of Dr. Heilig, there is no requirement that gross negligence be proven by expert testimony.

Dr. Heilig also contends that the trial court erred by instructing the jury that it could award to the Estate the medical costs of Rebecca's revision surgery. Specifically, he argues that the "[plaintiffs'] expert, Dr. Hugate, never testified that [Rebecca's] medical bills were causally connected to the alleged breach in the standard of care." He challenges Bill Pritchard's testimony concerning the medical bills because "he lacks personal knowledge sufficient to

testify." We hold that the trial court did not err by instructing the jury that it could award these damages.

Rebecca's evidence showed that the costs of her revision surgery were proper, reasonable, and directly attributable to Dr. Heilig's failure to meet the standard of care. Evidence offered by the Estate's expert, Dr. Ronald Hugate, indicated that the hip revision procedure undertaken by Dr. Yerasimides would not have been necessary if Dr. Heilig had appreciated the consequences of his over-reaming of the native acetabulum and had taken remedial measures to address the complication. The authenticity of her past medical bills was never challenged. This evidence was sufficient. *See Miller v. Mills*, 257 S.W.2d 520 (Ky. 1953). The trial court did not err by instructing the jury that it could award the value of the medical expenses associated with the hip replacement surgery undertaken by Dr. Heilig on May 8, 2018.

We affirm the judgment of the Clark Circuit Court.


ALL CONCUR.

BRIEFS FOR APPELLANT:          BRIEF FOR APPELLEE:

Donald L. Miller, II            Charles C. Adams
Brandon C. R. Sword             Lexington, Kentucky
Louisville, Kentucky